# IN THE SUPREME COURT OF CALIFORNIA

IN RE J.G., a Person Coming
Under the Juvenile Court Law.

THE PEOPLE,
Plaintiff and Respondent,
v.
J.G.,
Defendant and Appellant.

S240397

Third Appellate District
C077056

Shasta County Superior Court
JDSQ122933901

February 25, 2019

Justice Chin authored the opinion of the court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Liu, Cuéllar, Kruger, and McKinster[*] concurred.

---

[*]     Associate Justice of the Court of Appeal, Fourth Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

IN RE J.G.

S240397


Opinion of the Court by Chin, J.


Under California's deferred entry of judgment procedure, an eligible minor, after admitting the charges in a petition alleging a violation of law and successfully completing probation, may have the charges dismissed and the juvenile court records sealed. (Welf. & Inst. Code, § 790.)[1] A minor granted deferred entry of judgment "may . . . be required to pay restitution to the victim or victims pursuant to the provisions of" the Welfare and Institutions Code. (§ 794.) In this case, the juvenile court granted deferred entry of judgment to J.G., who was charged by petition with trespassing and vandalism, on condition that he pay restitution in the total amount of $36,381, at the rate of $25 per month. It later found that J.G. had successfully completed all terms of his probation other than the restitution requirement, dismissed the petition, and ordered that the restitution award may be enforced as a civil judgment. On appeal, J.G. challenged the restitution order, arguing that the juvenile court erred by: (1) converting the unpaid restitution to a civil judgment; (2) considering, in determining his ability to pay restitution, the benefits he received from the federal Supplemental Security Income Program (SSI); (3) finding, based on his receipt of SSI benefits, that he had the ability to pay restitution; and (4) imposing an amount that exceeded the

_____

[1] All further unlabeled statutory references are to the Welfare and Institutions Code.

1

$20,000 per-tort-cap set forth in section 742.16, subdivision (n). The Court of Appeal rejected these arguments and affirmed the juvenile court's judgment. For reasons explained below, we likewise reject J.G.'s first and second arguments. However, based on concessions by the People with respect to the third argument, we remand the matter for a new hearing regarding J.G.'s ability to pay restitution. In light of this disposition, we do not address J.G.'s fourth argument.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On June 6, 2012, the Shasta County District Attorney filed a petition under section 602 alleging that J.G. was within the jurisdiction of the juvenile court because he had committed the following offenses: (1) vandalism (Pen. Code, § 594, subd. (b)(2)); (2) throwing an object at a vehicle (Veh. Code, § 23110, subd. (b)); (3) trespass and damage or removal of highway signs (Pen. Code, § 602, subd. (f)); and (4) trespass by entering and occupying property (Pen. Code, § 602, subd. (m)). In support of these charges, the petition alleged that J.G. had entered and occupied real property and a structure at Shasta State Historic Park and had defaced, damaged, and destroyed signs, brick walls, wood railings, skylights, and a roof at the park. Accompanying the petition was a filing indicating that J.G. was eligible for deferred entry of judgment. Several months later, the probation department recommended that the court grant deferred entry of judgment subject to several conditions, including J.G.'s payment of restitution in the amount of $30,156.

The court and the parties reached an agreement as to the matter's resolution, which was implemented at a hearing in January 2013. Pursuant to the agreement, J.G. admitted the allegations of an amended petition containing only the first and

fourth counts of the original petition: vandalism and trespassing. After reviewing the probation department's proposed terms and conditions, J.G. acknowledged on the record that he had read and understood them and he agreed to follow them. The court then granted deferred entry of judgment and imposed the proposed conditions. However, consistent with the statement of J.G.'s counsel at the beginning of the hearing that J.G. would not waive "a hearing, pursuant to [section] 742.16, on the ability to pay" restitution, the court stated that restitution would "be determined" and that the restitution order would be "held in abeyance until [section] 790 has ended," at which time the court would "make the appropriate findings." The written conditions, with the court's handwritten revisions, direct that J.G. "pay restitution to the California State Park in the amount to be determined," and state that the restitution order (1) is "to remain in effect until paid in full pursuant to . . . [sections] 730.6/730.7," (2) is "not discharged upon termination of probation or deferred entry of judgment," and (3) is "held in abeyance until [section] 790 has ended at which time the court will make the appropriate findings."

About nine months later, J.G. submitted a written request for "a bifurcated hearing" on the restitution issue, asserting that section 742.16 required the court to consider his ability to pay in determining restitution. He requested that the court first determine whether he had the ability to pay restitution, and that it later hold "a full restitution hearing" to consider the amount of restitution only upon finding he "has the ability to pay." The People responded in writing that they had "no objection to the minor's request for a bifurcated hearing." Consistent with J.G.'s request, the court held a hearing in December 2013 solely to determine J.G.'s ability to pay

restitution. There was testimony at that hearing that J.G. received a monthly SSI payment in excess of $700 because of disability. At the end of the hearing, the court did not make a finding on ability to pay, but instead requested briefing on whether J.G.'s "SSI disability" benefits could "be used for restitution purposes."

The matter again came on for hearing on January 29, 2014. At the beginning of the hearing, the court announced its finding that J.G. had the ability to pay restitution, explaining: "[J.G.] receives . . . approximately 750 dollars a month. It's between 733 and 766, depending on the testimony and records. He receives from SSI for his [attention deficit hyperactivity disorder (ADHD)] and this sum is received monthly. [¶] After hearing the testimony, it revealed that the money was not provided with any restrictions on how it was to be spent. There is no requirement that he spend this money as the result of his ADHD for educational purposes, for treatment, whether it be psychological or medical, no requirement that he take any medications. And as a matter of fact, there is no requirement that this money be spent at all to alleviate the problems that he suffers from, from his ADHD. In fact, the testimony was that the money was spent by the parents for general household expenses. Some of it [is] spent on him, but basically whatever was necessary, it was spent on. And after having read and considered the briefs and arguments, I find that he does have the ability to pay."

J.G.'s counsel asked to "be heard" regarding the ruling, but the court denied the request and announced, "Now, we need to set a restitution hearing." J.G.'s counsel responded that she wanted to challenge the court's ruling on J.G.'s ability to pay through "an immediate writ" because she believed that federal

law precluded using SSI payments to pay restitution. She then explained, "What I would like to do is provisionally agree to whatever amount, reserving the right to have a restitution hearing." She later added: "What I would like to do is get some kind of provisional agreement. Obviously, we're not going to agree to the whole amount but because of the urgency of the situation now, it's more important at this point I think that we get this to [an appellate court] so that a decision can be made as to what [J.G.'s] mother as the payee [of the SSI money] is supposed to do." The court then discussed the repair estimate with the prosecution, commenting that the amount requested — in excess of $30,000 — seemed "enormous" and "somewhat excessive." Ultimately, the court announced it would set "an ability to pay amount today" with "restitution reserved." J.G.'s counsel stated that the court's proposal was acceptable "[a]s long as we're reserving our right to a hearing." The court responded, "Oh, yes. I wouldn't do otherwise." It then stated, "I'm going to set the amount of restitution at this time in the amount of 25 dollars a month. That can change based on ability to pay." The clerk interjected that the court needed to make a finding regarding the total amount "that is ordered to be paid back." J.G proposed $300, and the prosecutor proposed the amount of the "original request," noting that the original repair estimate was $36,381. When asked to comment on the prosecutor's proposal, J.G.'s counsel stated, "Reserve." The court then stated, "We can adjust that after hearing," to which the prosecutor added, "And that would be my thought. That it's a tentative and it starts the ball rolling and if we need a hearing down the road, we can do that." Consistent with these proceedings, in written findings and orders, the court found that J.G. had the ability to pay restitution, set the monthly amount at $25 per month and the

total amount at $36,381, and granted the prosecutor's "request[]" that "restitution be reserved once [the amount] is determined."

At the end of the January hearing, the court also set a date to review J.G.'s performance on probation. Shortly before the January hearing, the probation department had requested a one year extension of J.G.'s probationary term so he could satisfy several unfulfilled probation conditions and the court could "determine a restitution amount." At a review hearing in July, the probation department reported that J.G. had satisfied all terms of probation other than payment of restitution. The court then asked, "How would you like to proceed with the restitution portion?" The prosecutor replied, "Convert to a civil judgment." When asked if she had "[a]ny objection to that," J.G.'s counsel responded: "None, Your Honor, with the understanding that we will be appealing . . . . I had discussed earlier filing a writ and changed my mind because I think this is the cleaner way to do it. It is with that understanding that we're going to go ahead and agree that [deferred entry of judgment] should be successfully completed, my client taken off probation, and then we'll appeal the decision about the ability to pay." The court responded: "All right. So at this point in time the previous restitution order for $36,381 will be converted to a civil judgment. We'll find that [J.G.] has otherwise successfully completed the terms of his Deferred Entry of Judgment, the petition will be dismissed, and his records will be automatically sealed." Consistent with these proceedings, the court's written findings and orders state: "The minor having successfully completed [his] grant of probation pursuant to [section] 793, the court orders probation *terminated*, the *petition dismissed*, and

the record sealed. . . . [The] balance of restitution if any is converted to a civil judgment.”

J.G. filed an appeal, arguing in relevant part that the juvenile court had erred by (1) converting the unpaid balance of restitution to a civil judgment, (2) considering his SSI benefits in determining his ability to pay restitution, (3) finding, based on his receipt of SSI benefits, that he had the ability to pay restitution, and (4) setting the total amount of restitution at over $36,000 notwithstanding section 742.16, subdivision (n), which limits the amount of restitution that may be ordered for a violation of Penal Code section 594 to $20,000 “for each tort of the minor.” The Court of Appeal rejected these arguments — some for procedural reasons and some on the merits — and affirmed the judgment.

We granted J.G.’s petition for review.

## II. DISCUSSION

### A. The Court Did Not Err in Ordering Conversion of the Unpaid Restitution Balance to a Civil Judgment.

In 2000, California voters enacted the deferred entry of judgment procedure (§ 790 et seq.) as part of Proposition 21, the Gang Violence and Juvenile Crime Prevention Act of 1998 (Act). Pursuant to this procedure, as to minors charged with criminal offenses in a section 602 petition who meet specified eligibility criteria, juvenile courts may, “in lieu of jurisdictional and disposition hearings,” “grant a deferred entry of judgment with respect to any offense charged in the petition, provided that the minor admits each allegation contained in the petition and waives time for the pronouncement of judgment.” (§ 791, subd. (a)(3).) A minor granted deferred entry of judgment is subject to

mandatory probation for one to three years. (§§ 791, subd. (a)(3), 794.) If the minor "perform[s] satisfactorily" during that period, "the charge or charges in the wardship petition shall be dismissed and the arrest upon which the judgment was deferred shall be deemed never to have occurred and any records in the possession of the juvenile court shall be sealed . . . ." (§ 793, subd. (c).)

A minor granted deferred entry of judgment "may . . . be required to pay restitution to the victim or victims pursuant to the provisions of" the Welfare and Institutions Code. (§ 794.) Given the facts of J.G.'s offenses, two restitution provisions of the Welfare and Institutions Code are potentially relevant: sections 730.6 and 742.16. The former, which we have called the "general" restitution statute (*Luis M. v. Superior Court* (2014) 59 Cal.4th 300, 307 (*Luis M.*)), requires courts to order minors "found to be a person described in Section 602" to, among other things, pay "[r]estitution to the victim or victims." (§ 730.6, subd. (a)(2)(B).) It also mandates that a restitution order issued pursuant to the section "shall be enforceable as a civil judgment" (*id.*, subd. (i)) and "may be enforced in the manner provided in Section 1214 of the Penal Code" (§ 730.6, subd. (r)).

The second potentially relevant restitution provision is section 742.16, subdivision (a), which provides in relevant part: "If a minor is found to be a person described in Section 602 of this code by reason of the commission of an act prohibited by Section 594 . . . of the Penal Code, and the court does not remove the minor from the physical custody of the parent or guardian, the court as a condition of probation, except in any case in which the court makes a finding and states on the record its reasons why that condition would be inappropriate, shall require the minor to wash, paint, repair, or replace the property defaced,

damaged, or destroyed by the minor or otherwise pay restitution to the probation officer of the county for disbursement to the owner or possessor of the property or both." Subdivision (j) of section 742.16 specifies that "[e]xecution may be issued on" a restitution order "issued by the court pursuant to" section 742.16 "in the same manner as on a judgment in a civil action, including any balance unpaid at the termination of the court's jurisdiction over the minor."

J.G. concedes that section 794 "incorporates sections 730.6 and 742.16 for purposes of imposing restitution as a condition of [deferred entry of judgment] probation." Indeed, we have recognized that, by virtue of section 794, restitution may be ordered under sections 730.6 and 742.16 in the deferred entry of judgment context. (*Luis M.*, *supra*, 59 Cal.4th at p. 303, fn. 3.) J.G. also concedes that sections 730.6 and 742.16 "contain provisions that allow unpaid restitution to be converted to a civil judgment." He asserts, however, that these conversion provisions do not apply in the deferred entry of judgment context in light of section 793, subdivision (c), which provides, "If the minor has performed satisfactorily during the period in which deferred entry of judgment was granted, at the end of that period the charge or charges in the wardship petition shall be dismissed and the arrest upon which the judgment was deferred shall be deemed never to have occurred and any records in the possession of the juvenile court shall be sealed." This language, J.G. asserts, "unambiguously prohibits conversion of unpaid restitution to a civil judgment," because "[d]eeming the underlying arrest never to have occurred and sealing all the related records — as section 793 commands — and converting unpaid restitution to a civil judgment, are mutually exclusive." For these actions "to coexist there would need to be some type of

exception to the arrest deeming and record sealing language," but the statute lists "only one exception," and it applies to determining whether the minor is eligible for a future grant of deferred entry of judgment. "Listing that exception, but not another that allows unpaid restitution to be converted to a civil judgment, is [a] strong indicator that unpaid restitution cannot be converted to a civil judgment."

J.G.'s argument fails in light of section 794. As already explained, that section specifies that minors granted deferred entry of judgment "may . . . be required to pay restitution . . . *pursuant to the provisions of*" the Welfare and Institutions Code. (§ 794, italics added.) As also already explained, the Welfare and Institutions Code further provides that "[e]xecution may be issued on" a restitution order issued pursuant to section 742.16 "in the same manner as on a judgment in a civil action, *including any balance unpaid at the termination of the court's jurisdiction over the minor*." (§ 742.16, subd. (j), italics added.) It also mandates that a restitution order issued pursuant to section 730.6 "shall be enforceable as a civil judgment" (*id.*, subd. (i)) and "may be enforced in the manner provided in Section 1214 of the Penal Code" (§ 730.6, subd. (r)). In turn, Penal Code section 1214, subdivision (b), states, among other things, that "[a]ny portion of a restitution order that remains unsatisfied after a defendant is no longer on probation . . . is enforceable by the victim pursuant to this section," and that the court, upon request, "shall provide the victim in whose favor the order of restitution is entered" and the California Victim Compensation Board "with a certified copy of" the restitution order. "In common understanding, the phrase 'pursuant to' means 'in conformance to or agreement with' and 'according to.' [Citation.]" (*Rodriguez v. American Technologies, Inc.* (2006)

136 Cal.App.4th 1110, 1122; see *Samarkand of Santa Barbara, Inc. v. County of Santa Barbara* (1963) 216 Cal.App.2d 341, 360 ["phrase 'pursuant to' means in ordinary connotation 'in conformity with' "].)  Thus, notwithstanding the language of section 793, by providing in section 794 that minors granted deferred entry of judgment may be required to pay restitution "pursuant to" — i.e., in conformity with and according to — the provisions of the Welfare and Institutions Code, the Legislature expressly authorized unpaid restitution in the deferred entry of judgment context to be converted to an enforceable civil judgment.  (Cf. *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 520 [statute's reference to dismissals "pursuant to" Pen. Code, § 1385 both confirms courts' power to dismiss under that section and requires strict compliance with its provisions].)

J.G. finds fault with this analysis.  It is "illogical," he asserts, to conclude that "section 794's oblique reference to 'other provisions of this code' somehow incorporated a restitution conversion provision that provides an additional exception to section 793's broad protections.  When the drafters want[] to allow unpaid restitution to survive the dismissal of the 602 petition, they know how to say so clearly."  J.G. points in particular to section 786, which provides in subdivision (a) that when "a person who has been alleged or found to be a ward of the juvenile court satisfactorily completes (1) an informal program of supervision pursuant to Section 654.2, (2) probation under Section 725, or (3) a term of probation for any offense, the court shall order the petition dismissed" and "shall order sealed all records pertaining to the dismissed petition."  Elsewhere in the section, J.G. emphasizes, the Legislature specified that a sealing order "does not prohibit a court from enforcing a civil judgment for an unfulfilled order of restitution ordered

pursuant to Section 730.6" and does "not relieve[]" a minor "from the obligation to pay victim restitution." (§ 786, subd. (h)(1).) It also specifies that "[a] victim or a local collection program may continue to enforce victim restitution orders . . . after a record is sealed," and that "[t]he juvenile court shall have access to records sealed pursuant to this section for the limited purpose of enforcing a civil judgment or restitution order." (*Id.*, subd. (h)(2).) "As a matter of statutory construction," J.G. argues, "the existence of an express exception in section 786 that allows unpaid restitution to be converted to a civil judgment is a strong indication that such an exception should not be read into section 793."

J.G.'s arguments are unpersuasive. To begin with, unlike J.G., we find nothing "oblique" about section 794's reference to "other provisions of" the Welfare and Institutions Code, and nothing "illogical" about concluding, for reasons already explained, that by providing in section 794 that minors granted deferred entry of judgment may be required to pay restitution "pursuant to" — i.e., in conformity with and according to — the provisions of the Welfare and Institutions Code, the Legislature expressly authorized unpaid restitution in the deferred entry of judgment context to be converted to an enforceable civil judgment, as specified in sections 730.6 and 742.16. What we do find illogical — and unpersuasive — is J.G.'s argument that section 793, which does not address restitution, somehow limits section 794's express incorporation, without limitation, of the other sections in the Welfare and Institutions Code regarding restitution.

Regarding J.G.'s reliance on the absence in the deferred entry of judgment statutes of the "express exception in section 786 that allows unpaid restitution to be converted to a civil

judgment," we note first J.G.'s failure to respond to the People's argument that, contrary to the premise underlying J.G.'s argument, section 786 in fact applies in the deferred entry of judgment context. In this regard, the People observe that section 786, subdivision (a), applies by its terms, not just to a person "*found* to be a ward of the juvenile court" who "satisfactorily completes . . . a term of probation for any offense," but also to a person "*alleged . . .* to be a ward of the juvenile court" who "satisfactorily completes" such "a term of probation." (Italics added.) But we need not, and do not, express an opinion regarding this threshold issue because J.G.'s argument fails for an independent reason: the language in section 786 on which J.G. relies was added by the Legislature in 2015 (Stats. 2015, ch. 368, § 1), about 15 years *after* California voters added sections 793 and 794 by approving the Act in 2000. This fact renders the principle of statutory construction J.G. invokes inapplicable. (*Traverso v. People ex rel. Dept. of Transportation* (1993) 6 Cal.4th 1152, 1166 [principle "is inapplicable when . . . the 'given provision' contained in a related statute was added by amendment many years after the enactment of the statute containing no such provision"].)

J.G. next argues that allowing conversion of unpaid restitution to an enforceable civil judgment would be contrary to the voters' intent in establishing the deferred entry of judgment procedure. He focuses on one of the measure's uncodified findings and declarations, which states that the Act expands rehabilitative options for "first time, non-violent juvenile felons" by requiring them "to appear in court, admit guilt for their offenses, and be held accountable, but also be given a non-custodial opportunity to demonstrate through good conduct and compliance with a court-monitored treatment and supervision

program that the record of the juvenile's offense should justly be expunged." (Voter Information Guide, Primary Elec. (Mar. 7, 2000) text of Prop. 21, § 2, subd. (j), p. 119.) Based on this statement, he asserts that the voters intended the deferred entry of judgment program "to be a 'carrot-and-stick' approach to juvenile crime," and that "[r]eading section 793 to authorize conversion of unpaid restitution to a civil judgment makes the carrot of expungement less rewarding than was intended."

J.G.'s argument is unpersuasive because reading section 793 to incorporate the conversion provisions of section 730.6 and 742.16 is fully consistent with the voters' intent, as disclosed by the statement on which J.G. relies, to further rehabilitation by holding minors "accountable" for their offenses. (Voter Information Guide, Primary Elec. (Mar. 7, 2000) text of Prop. 21, § 2, subd. (j), p. 119.) As we have explained, "[a]n order of direct victim restitution" under these provisions "acts to make the victim whole, rehabilitate the minor, and deter future delinquent behavior." (*Luis M.*, *supra*, 59 Cal.4th at p. 305; see *People v. Anderson* (2010) 50 Cal.4th 19, 34 [requiring payment of restitution "renders defendant accountable for the financial harm he caused and contributes to his reformation and rehabilitation"]; *Charles S. v. Superior Court* (1982) 32 Cal.3d 741, 747 (*Charles S.*) ["a requirement of restitution may serve a rehabilitative function consistent with the purposes of Juvenile Court Law"].) "[R]estitution serves valid . . . rehabilitative objectives by . . . helping [offenders] appreciate the harm done to the victim" (*People v. Cookson* (1991) 54 Cal.3d 1091, 1097) and "holding [them] accountable for [their] actions" (*In re J.S.* (2016) 6 Cal.App.5th 414, 421). Thus, contrary to J.G.'s argument, reading section 793 to incorporate the conversion provisions of sections 730.6 and 742.16 serves the voters' intent,

as reflected by the statement J.G. cites and by the voters' specification in section 794 that minors granted deferred entry of judgment "may . . . be required to pay restitution to the victim or victims pursuant to the provisions of" the Welfare and Institutions Code.

For the preceding reasons, we reject J.G.'s argument that the juvenile court erred in converting the amount of unpaid restitution to a civil judgment.[2]

## B. The Juvenile Court Did Not Violate Federal Law By Considering J.G.'s SSI Benefits.

J.G.'s second claim is that the juvenile court, in determining his ability to pay restitution, violated federal law by considering the SSI benefits he received.[3]  He relies on 42

---

[2]   Our conclusion renders it unnecessary to address the People's claim that J.G.'s actions below estop him from arguing on appeal that the deferred entry of judgment statutes preclude conversion of unpaid restitution to a civil judgment.  It also necessarily defeats J.G.'s related claim that, because the restitution obligation "ceases to exist" when the minor "completes" the deferred entry of judgment procedure, the court was required to set restitution in an amount that he could repay during the deferral period.  *Charles S.*, which J.G. cites in support of his argument, is inapposite.  There, we held that a probation officer abused his discretion by ordering restitution in an amount that rendered the minor ineligible for informal probation because it was "conceded[ly] . . . beyond the family's ability to pay."  (*Charles S.*, *supra*, 32 Cal.3d at p. 751.)  Here, the total restitution amount the court ordered did not render J.G. ineligible for the deferred entry of judgment procedure.

[3]   J.G. also argues in his briefs that the juvenile court erred by considering the benefits his father received under the Social Security Disability Insurance Program (SSD).  The record shows that he did not make this argument in the juvenile court.  On

U.S.C. section 407(a), which provides: "The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law."[4]  He also relies on the United States Supreme Court's statement in *Washington State Dept. of Social and Health Services v. Guardianship Estate of Keffeler* (2003) 537 U.S. 371, 385 (*Keffeler*), that the phrase "other legal process" in 42 U.S.C. section 407(a) would "at a minimum . . . seem to require utilization of some judicial or quasi-judicial mechanism . . . by which control over property passes from one person to another in order to discharge or secure discharge of an allegedly existing or anticipated liability."  He argues that a court's consideration of SSI benefits in determining the ability to pay restitution qualifies under the high court's statement as "other legal process" because "[i]t is undeniably a judicial mechanism designed to secure discharge, to the maximum extent possible, of an enforceable liability (restitution) and it is

---

the contrary, he argued that decisions involving SSD payments, as opposed to SSI payments, have "only marginal relevance to [his] case."  Moreover, it was his own counsel who first elicited testimony regarding his father's SSD payments.  Nor did J.G. raise the issue in the Court of Appeal, and the Court of Appeal's opinion consequently did not address it.  We therefore decline to consider his argument.

[4]    42 U.S.C. section 407 addresses payments made under Title II of the Social Security Act, which is the Old–Age, Survivors, and Disability Insurance plan of benefits.  42 U.S.C. section 1383(d) makes it applicable to SSI benefits paid under Title XVI of the Social Security Act.

by no means consistent with providing for the beneficiary's care and maintenance as it ultimately diverts funds from the beneficiary to a third party victim."

The People disagree, asserting that a court's "[c]onsideration of SSI . . . benefits to determine how much total financial support a minor has is not the same as requiring the minor to use those benefits to satisfy 'legal process.' " According to the People, although a court may not "order" a minor to use SSI benefits "to pay restitution," it may consider those benefits "when making the ability to pay determination." Ignoring those benefits, the People assert, "would create a distorted picture of [the minor's] financial situation." Here, the juvenile court did not violate federal law because it "did not order [J.G.] to pay money from his social security benefits," but "only considered that money in determining [his] financial status."[5]

---

[5] Section 730.6, subdivision (h)(1), provides in part that "[a] minor's inability to pay shall not be considered a compelling or extraordinary reason not to impose a restitution order, nor shall inability to pay be a consideration in determining the amount of the restitution order." Notwithstanding this provision, throughout this case, the parties have treated J.G.'s ability to pay restitution as relevant under section 742.16, subdivision (a), which directs a court, if it imposes restitution, to (1) "make a finding of the amount . . . that would be required to fully compensate the owner and possessor of the property for their damages," and (2) "order the minor or the minor's estate to pay that restitution . . . *to the extent the court determines that the minor or the minor's estate have the ability to do so*, except in any case in which the court makes a finding and states on the record its reasons why full restitution would be inappropriate." (Italics added.) For purposes of this opinion, we therefore will assume that J.G.'s ability to pay restitution is relevant.

17

The United States Supreme Court has applied the relevant language of 42 U.S.C. section 407(a), in several cases, most notably for present purposes in *Keffeler*. At issue there was whether the State of Washington had violated 42 U.S.C section 407(a) by using SSI benefits it had received as a representative payee on behalf of children in foster care to reimburse itself for some of its foster care expenditures. (*Keffeler*, *supra*, 537 U.S. at p. 375.) The key question in resolving this issue, the court stated, was whether Washington's "effort to become a representative payee, or its use of [the children's] Social Security benefits when it acts in that capacity, amounts to employing an 'execution, levy, attachment, garnishment, or other legal process' within the meaning of [42 U.S.C. ]§ 407(a)." (*Keffeler*, at pp. 382-383.) "For obvious reasons," the court reasoned, Washington's activities do not "involve any execution, levy, attachment, or garnishment. These legal terms of art refer to formal procedures by which one person gains a degree of control over property otherwise subject to the control of another, and generally involve some form of judicial authorization. [Citations.] [Washington's] efforts to become a representative payee and to use [the children's] benefits do not even arguably employ any of these traditional procedures." (*Id.* at p. 383.) Nor, the high court held, do Washington's efforts "involve[] 'other legal process,' as the statute uses that term." (*Ibid.*) Although Washington does, "in the abstract . . . use legal process as the avenue to reimbursement" — in that it is appointed as a representative payee through "a federal legal process" and "makes claims against the accounts kept by the state treasurer" through "a state legal process" — the statute "uses the term 'other legal process' far more restrictively, for under the established

interpretative canons of *noscitur a sociis* and *ejusdem generis*, ' "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." ' [Citations.] Thus, 'other legal process' should be understood to be process much like the processes of execution, levy, attachment, and garnishment, and at a minimum, would seem to require utilization of some judicial or quasi-judicial mechanism, though not necessarily an elaborate one, by which control over property passes from one person to another in order to discharge or secure discharge of an allegedly existing or anticipated liability." (*Id.* at pp. 384-385.) Washington's efforts to become a representative payee and its use of the children's benefits in that capacity "involve nothing of th[is] sort. Whereas the object of the processes specifically named is to discharge, or secure discharge of, some enforceable obligation, the State has no enforceable claim against its foster children. And although execution, levy, attachment, and garnishment typically involve the exercise of some sort of judicial or quasi-judicial authority to gain control over another's property, [Washington's] reimbursement scheme operates on funds already in [its] possession and control, held on terms that allow the reimbursement." (*Id.* at p. 386, fn. omitted.)

In reaching its conclusion, the *Keffeler* court distinguished two prior decisions in which it had found violations of 42 U.S.C. section 407(a): *Philpott v. Essex County Welfare Bd.* (1973) 409 U.S. 413, and *Bennett v. Arkansas* (1988) 485 U.S. 395. (*Keffeler*, *supra*, 537 U.S. at p. 388.) These cases, the court explained, "involved forms of legal process expressly prohibited by [42 U.S.C.] § 407(a)," i.e., "judicial actions in which a State *sought to attach* a beneficiary's Social Security benefits as

reimbursement for the costs of the beneficiary's care and maintenance." (*Ibid.*, italics added.) Thus, "[i]n each case, . . . the plain language of [42 U.S.C.] § 407(a) barred the State's legal action." (*Keffeler*, at p. 388.) "Although it is true that [Washington] could not directly compel the beneficiary or any other representative payee to pay Social Security benefits over to the State, that fact does not render the appointment of a self-reimbursing representative payee at odds with the Commissioner's mandate to find that a beneficiary's 'interest . . . would be served' by the appointment." (*Id.* at p. 389.)

In light of *Keffeler*, J.G.'s claim that consideration of his SSI benefits in determining his ability to pay constitutes "legal process" for purposes of applying 42 U.S.C. section 407(a) is unpersuasive.[6] Although such consideration did, "in the abstract," involve "legal process" (*Keffeler*, *supra*, 537 U.S. at p. 384) — a judicial proceeding in which a court determined J.G.'s ability to pay restitution — as *Keffeler* held, 42 U.S.C. section 407(a) "uses the term 'other legal process' far more restrictively" (*Keffeler*, at p. 384) — i.e., "process much like the processes of execution, levy, attachment, and garnishment" (*Keffeler*, at p. 385) — "and at a minimum, would seem to require utilization of some judicial or quasi-judicial mechanism . . . by which control over property passes from one person to another in order to discharge or secure discharge of an allegedly existing or anticipated liability" (*ibid.*). "On this restrictive understanding

---

[6] "For obvious reasons," J.G. "do[es] not contend" that considering his SSI benefits in determining his ability to pay restitution "involve[s] any execution, levy, attachment, or garnishment." (*Keffeler*, *supra*, 537 U.S. at p. 383.) This act, like Washington's efforts in *Keffeler*, "do[es] not even arguably employ any of these traditional procedures." (*Ibid.*)

of 'other legal process,' it is apparent that [mere consideration of J.G.'s SSI payments in determining his ability to pay restitution] involve[s] nothing of the sort." (*Id.* at p. 386.) "[T]he object of the processes specifically named" in 42 U.S.C. section 407(a) — "*to discharge, or secure discharge of, some enforceable obligation*" (*Keffeler*, at p. 386, italics added) — is different from the object of the process at issue here — to determine in the first instance whether to impose an enforceable obligation, i.e., restitution. Nor does considering SSI benefits in making this determination "involve" an exercise of judicial authority "to gain control over" those benefits, which is the characteristic of the processes 42 U.S.C. section 407(a) specifies — execution, levy, attachment, and garnishment — and on which *Keffeler* focused. (*Keffeler*, at p. 386.) Under *Keffeler*, 42 U.S.C. section 407(a) does not preclude a court from considering SSI benefits in determining the ability to pay restitution.

Our conclusion is consistent with a number of decisions holding — sometimes based on *Keffeler* — that 42 U.S.C. section 407(a) or a similar anti-attachment provision does not preclude consideration of benefits in determining the recipient's ability to pay restitution or some other financial obligation. (*In re Lampart* (Mich.Ct.App. 2014) 856 N.W.2d 192, 200 [effect of 42 U.S.C. § 407(a) in ordering restitution]; *Orange v. White* (Mo.Ct.App. 2016) 502 S.W.3d 773, 776-778 [effect of 42 U.S.C. § 407(a) in determining ability to pay maintenance to former spouse]; *Kays v. State* (Ind. 2012) 963 N.E.2d 507, 511 [effect of 42 U.S.C. § 407(a) in ordering restitution]; *Barnes v. Department of Human Services* (Miss. 2010) 42 So.3d 10, 17 [effect of 42 U.S.C. § 407(a) in calculating child support payments]; *Com. ex rel. Morris v. Morris* (Ky. 1998) 984 S.W.2d 840, 841-842 [effect of 42 U.S.C. § 407(a) in determining child support]; *Gleave v.*

*Graham* (W.D.N.Y. 1997) 954 F.Supp. 599, 610-611 [effect, in determining criminal fine, of federal statute providing that veterans' benefits " 'shall not be liable to attachment, levy, or seizure by or under any legal or equitable process whatever' "]; *Fredenburg v. Mental Health Div.* (Or.Ct.App. 1991) 812 P.2d 432, 428 [effect of 42 U.S.C. § 407(a) in determining liability for cost of care]; *Heuchan v. Heuchan* (Wash. 1951) 228 P.2d 470, 476-477 [effect, in determining alimony obligation, of federal statute providing that railway pension payments shall not be " 'subject to any tax or to garnishment, attachment, or other legal process under any circumstances' "].)

J.G. cites several decisions to support his position, but they do not persuade us to adopt his view that 42 U.S.C. section 407(a) precludes all consideration of SSI benefits "for purposes of assessing a defendant's ability to pay restitution." In *In re S.M.* (2012) 209 Cal.App.4th 21, 30, the court held that the juvenile court had erred by considering SSI benefits in determining a person's ability to pay legal fees in a dependency case. However, the court rested its decision entirely on a *state* statute and did not even cite 42 U.S.C. section 407(a) in its opinion. (*In re S.M.*, at p. 570 ["California law is clear that SSI benefits are not considered income for purposes of determining child support obligations."].) Thus, the court in *In re S.M.* did not, as J.G. asserts, hold that considering SSI benefits in determining ability to pay violates "the federal anti-attachment provisions."

In *In re Cramner* (10th Cir. 2012) 697 F.3d 1314, 1315, the court held that a Chapter 13 bankruptcy debtor, in submitting a proposed repayment plan, may exclude SSI benefits in calculating his projected disposable income. However, the court based its decision on "the plain language of the Bankruptcy

Code" (*id.* at p. 1318), which, the court stated, "expressly allows [a debtor] to exclude [SSI benefits] from the disposable income calculation" (*id.* at p. 1317). The court went on to add that its conclusion was "bolstered by" 42 U.S.C. section 407(a), "which shields [SSI] payments . . . from 'execution, levy, attachment, garnishment, or other legal process,' or from 'the operation of any bankruptcy or insolvency law.' " (*In re Cramner*, at p. 1318.) Contrary to J.G.'s assertion, this brief statement, added merely to "bolster[]" the court's conclusion based on "the plain language of the Bankruptcy Code" (*ibid.*), hardly constitutes a holding that 42 U.S.C. section 407(a) "prohibit[s] treating Social Security benefits as income." In any event, *In re Cramner* was a bankruptcy case, and the part of 42 U.S.C. section 407(a) that was there relevant — SSI benefits are not "subject to . . . the operation of any bankruptcy or insolvency law" — is inapplicable in the nonbankruptcy case now before us.

In *State v. Eaton* (Mont. 2004) 99 P.3d 661, 666, the court held that an order requiring the defendant to make restitution payments equal to 20 percent of his net monthly income "conflicted with" 42 U.S.C. section 407(a) insofar as it required his social security benefits to be included in his net income. The order, the court stated, "improperly burden[ed] [the defendant's] social security benefits" and constituted "an improper attempt to subject" them "to 'other legal process.' " (*Eaton*, at p. 666.) In response to the state's view that the defendant could simply "raise this defense at the time [the state] would seek a levy," the court stated, "it is appropriate to eliminate the offending condition from the judgment in the first instance." (*Ibid.*) Given this response, it is unclear whether the *Eaton* court held that a court may not order a defendant to make payments with social security benefits — a proposition with which the People here do

not disagree — or that a court may not consider SSI benefits in determining a defendant's ability to pay restitution — which is the proposition for which J.G. cites *Eaton*. Insofar as it speaks to the latter issue, its summary analysis is unpersuasive and out of step with the weight of authority, as set forth above.

Finally, in *City of Richland v. Wakefield* (Wn. 2016) 380 P.3d 459, 461-467 (*Wakefield*), the court vacated an order requiring a homeless, disabled, and indigent defendant, whose only income was $710 per month in SSI payments, to pay $15 each month to reimburse the state for the cost of her prosecution. As J.G. observes, the court relied in part on 42 U.S.C. section 407(a). (*Wakefield*, at pp. 465-466.) However, this discussion was dictum because it was preceded by the court's conclusion that the order violated *state* law in numerous ways (*id.* at pp. 464-465) and was followed by the court's conclusion that substantial evidence did not support the factual findings on which the order was based (*id.* at p. 466). Moreover, the entire opinion was advisory because the parties had agreed that, as a matter of state law, the order was erroneous and the defendant's reimbursement payments should be remitted, and they had asked the court to remand the case for entry of an order remitting the payments. (*Id.* at pp. 461, 463.) The court itself explained that it was "nonetheless" (*id.* at p. 463) discussing the claim's merits at the "request" of the parties "to provide guidance . . . in the future" (*id.* at p. 461).

In any event, the *Wakefield* court's dictum regarding 42 U.S.C. section 407(a) does not, as J.G. suggests, state that 42 U.S.C. section 407(a) precludes all consideration of SSI benefits in determining a recipient's ability to pay a legal obligation. Instead, it states that "federal law prohibits courts from ordering defendants to pay [reimbursement costs] if [their] only

source of income is social security disability" because, under *Keffeler*, such an order would constitute "other legal process" within the meaning of 42 U.S.C. section 407(a). (*Wakefield*, *supra*, 380 P.3d at p. 466.) In this regard, the court's discussion notably diverged from one of the authorities on which it purported to rely: *In re Lampart, supra*, 856 N.W.2d 192. (*Wakefield, supra*, 380 P.3d at p. 466.) There, the court held that, as to a person whose "only source of income was $730 per month in [SSD] benefits" (*In re Lampart*, at p. 194), 42 U.S.C. section 407(a) did not prohibit either "consider[ation]" of the benefits "as income for purposes of fashioning a restitution order" or actual imposition of a restitution obligation (*In re Lampart*, at p. 200). Instead, it only precluded using the judicial contempt power to compel the recipient actually to use benefits to pay restitution. (*Ibid.*) Consistent with these holdings, the court provided the following instructions for further proceedings: "If it [is] determined [on remand] that [the recipient's] only asset, or source of income, is and remains from [SSD] benefits, 42 U.S.C. § 407(a) prohibits the use of legal process . . . from reaching those benefits to satisfy the restitution order. [Citation.] If, however, [she] is found to have income aside from her [SSD] benefits, or other assets that are derived from other sources, that income or those assets could be used to satisfy the restitution award. The restitution order itself remains valid. Indeed, [her] receipt of [SSD] benefits does not immunize her from the restitution order; rather, it merely prohibits the trial court from using legal process to compel satisfaction of the restitution order from those benefits. Because it is possible that [she] may have assets or may receive income from other sources in the future, we affirm the trial court's

25

refusal to cancel or modify [the] restitution obligation." (*In re Lampart*, at p. 203.)

Relying on *Wakefield* while ignoring *In re Lampart*, J.G. argues that "where, as here, an individual's only source of 'income' is Social Security benefits," "a distinction between treating Social Security benefits as income to assess an individual's ability to pay restitution and requiring their use to pay restitution . . . is a distinction without a difference." The People respond that J.G.'s argument "overlooks the fact that, among other things, a court can consider . . . a minor's future earning capacity, i.e., ability to obtain employment, when determining whether he or she has an ability to pay."

In light of developments at oral argument, we need not take a position on these competing views in order to dispose of this case. Refining their position, the People stated during oral argument that the ability to pay determination in this case would be "improper" if the juvenile court "was contemplating the social security money as the source of the restitution payments," i.e., that J.G. could pay "from [his] social security money." The People also conceded that (1) it would be "reasonable" to conclude from the record that this was, in fact, the basis for the court's decision, and (2) on this reading of the record, the correct remedy would be to remand for a new ability to pay hearing, during which the juvenile court could consider J.G.'s future earning capacity and the total amount of restitution to be ordered.

We agree with the People that the record indicates the juvenile court "was contemplating the social security money as the source of the restitution payments." As earlier detailed, in its prefatory remarks, the court discussed only matters related

to J.G.'s SSI benefits, including the amount he received, whether there were any "restrictions" or "requirements" as to "how" the money "was to be spent," and how the money was "[i]n fact" being spent. The record reflects no express finding regarding J.G.'s future earning capacity, no mention of it as a basis for the juvenile court's determination, and no reference to it in the parties' briefs and arguments. Given our reading of the record, we accept the People's concession that the proper disposition of this case is to reverse the judgment and remand for a new ability to pay hearing that includes consideration of J.G.'s future earning capacity, his current financial circumstances, and the total amount of restitution to be ordered.[7]

---

[7] In light of this analysis, we need not, and do not, address J.G.'s claim that the total amount of restitution violated the $20,000 per-tort-cap set forth in section 742.16, subdivision (n).

### III. DISPOSITION

For the foregoing reasons, the Court of Appeal's judgment is reversed and the matter is remanded for further proceedings consistent with this opinion.

**CHIN, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**McKINSTER, J.**<sup>*</sup>

---

*    Associate Justice of the Court of Appeal, Fourth Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re J.G.

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 7 Cal.App.5th 955
**Rehearing Granted**

_____

**Opinion No.** S240397
**Date Filed:** February 25, 2019

_____

**Court:** Superior
**County:** Shasta
**Judge:** Monique D. McKee

_____

**Counsel:**

William C. Whaley, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Rachelle A. Newcomb and Brook A. Bennigson, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

William C. Whaley
770 L Street, Suite 1000
Sacramento, CA  95814
(916) 607-6561

Brook A. Bennigson
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 210-7688